[No. A056917. First Dist., Div. One. Feb. 17, 1993.]

DAVE MEANEY, as Superintendent, etc., et al., Plaintiffs and Appellants,
v.
SACRAMENTO HOUSING AND REDEVELOPMENT AGENCY et al.,
Defendants and Respondents.

568

**COUNSEL**

Brinley & Schott, Leonard D. Brinley, John W. Short and Steven M. Schott for Plaintiffs and Appellants.

Brenton A. Bleier and Alan C. Campbell for Defendants and Respondents.

## OPINION

**NEWSOM, J.**—Four school districts in the Sacramento area, joined by the Sacramento County Superintendent of Schools (hereafter referred to collectively as School Districts), appeal an order dismissing their first amended petition for writ of mandate and complaint for a validating proceeding against the Sacramento Housing and Redevelopment Agency (hereafter the Agency), the City of Sacramento (hereafter the City) and City Council of the City of Sacramento (hereafter the City Council), and the County of Sacramento and Board of Supervisors of the County of Sacramento (hereafter the County). After being filed in Sacramento County Superior Court on November 7, 1990, the action was transferred to the Contra Costa County Superior Court on the School Districts' motion for change of venue. The defendants filed a demurrer which the trial court sustained. When the School Districts filed a first amended petition and complaint, the defendants again countered with a demurrer. The court then sustained the demurrer without leave to amend and entered an order dismissing the action.

The alternative theories alleged in the petition and complaint are each directed against an agreement dated October 10, 1990, between the County and the Agency concerning the construction of a new county courthouse (hereafter the Courthouse Agreement). The petition for writ of mandate seeks relief on the ground that the Courthouse Agreement violates the California Environmental Quality Act. The complaint for a validating proceeding seeks review of the Courthouse Agreement pursuant to Code of Civil Procedure section 860 et seq., on the ground that it improperly provides for tax increment financing to pay the cost of the proposed courthouse. We will consider the validating proceeding first.

The first amended petition and complaint allege two separate causes of action for a validating proceeding. The second cause of action alleged in extremely general terms: "[t]he decisions of the [defendants] approving the [Courthouse] Agreement were not supported by the evidence before them; the [defendants] did not proceed in the manner required by law; there was not a fair hearing; and the decisions of the [defendants] were arbitrary, capricious, entirely lacking in evidentiary support, unlawful and procedurally unfair." The third cause of action alleges that the Courthouse Agreement was not authorized under Health and Safety Code section 33445.[1]

The disputed Courthouse Agreement concerns the Agency's Richards Boulevard Redevelopment Project, covering a large area of urbanized land

---

[1] All further statutory citations will be to the Health and Safety Code unless otherwise indicated.

within the City that extends more than 25 blocks east-west and forms a kind of irregular tear-drop shape near the confluence of the American and Sacramento Rivers. The redevelopment plan for the project, adopted by the City Council on July 17, 1990, contemplates the construction of new housing, industrial and commercial properties, and certain public facilities including a county courthouse complex, a public park, expanded water treatment plant, and a detoxification center. The plan is effective for a period of 35 years and permits the Agency to incur long-term indebtedness repayable over any term within this period. Though it authorizes other forms of financing, the redevelopment plan appears to place principal reliance on tax increment financing. Section 325 of the redevelopment plan specifically authorizes this form of financing to pay for the cost of public facilities.

Tax increment financing rests on powers uniquely granted to redevelopment agencies under sections 33760 through 33769 and the California Constitution, article XVI, section 16. Under this form of financing, the total assessed valuation within the redevelopment project, available for taxation by local districts and governments, is in effect frozen at the level "last equalized prior to the effective date of the ordinance" adopting the redevelopment plan. (§ 33670, subd. (a).) Thereafter, the taxes collected on all increases in property values throughout the term of the project, attributable to inflation or private investment within the project, must be "paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness . . . incurred by the redevelopment agency to finance . . . the redevelopment project." (§ 33670, subd. (b).)

Under the terms of the Courthouse Agreement, the County agrees to forego "the right to contest the establishment of the Redevelopment Plan for the Project," and the Agency agrees to help finance the cost of the proposed county courthouse and other related "County public facilities." The Agency's entire obligation is stated in two sentences: "During the life of the Project, the Agency agrees to set aside from the tax increment, as defined below, the amount the County would have received in property taxes from the . . . Project Area . . . but for the division of Property taxes in accordance with Health and Safety Code Section 33670. Such amounts shall be used for the purpose of assisting the County in financing the costs for plans and specifications and construction for a new County courthouse and other Agency approved County public facilities consistent with the Redevelopment Plan." Although the Courthouse Agreement does not commit the Agency to any specific form of financing, section 3 makes provision for the possible issuance of tax increment bonds by authorizing the Agency "to

subordinate the County's interest herein . . . to secure the repayment of Agency indebtedness incurred for the Project."

The School Districts complain that the Courthouse Agreement will allow the County to finance construction of a new courthouse by diverting tax revenue that would otherwise go to schools. They argue that "this agreement will require the Agency to capture a significantly greater amount of tax increment from the Project in order to finance both its agreement with the County and implementation of the Project. The capture of these additional tax revenues will come at the expense of the property tax revenues that would otherwise be received by the Schools and other taxing agencies."

They challenge the Courthouse Agreement, first, on the ground that "the only authorization for the Agreement," is found in section 33401 rather than in the statute on which defendants rely, section 33445. The parties to the Courthouse Agreement sought explicitly to proceed under the provisions of section 33445. The Agency and the City made findings required by section 33445, not those required by section 33401, and the Courthouse Agreement invokes the authority of section 33445 in recital "C." By implication, the School Districts contend that the Courthouse Agreement is invalid, and the parties must negotiate a new agreement pursuant to the provisions of section 33401. The reasons for the School Districts' preference for that section are clear. Section 33401, subdivision (b) calls for findings "supported by substantial evidence"—and thus presumably subject to judicial review. In contrast, section 33445 limits the scope of judicial review through language we will later analyze in detail.

■ The School Districts argue that "[o]nly . . . section 33401(b) authorizes a redevelopment agency to make available to other taxing agencies a share of the tax increment derived from a redevelopment project." We, however, find in section 33445 no restriction on the authority of the Agency to make payments out of such tax increment revenues.

In pertinent part, section 33445 provides: "an agency may, with the consent of the legislative body, pay all or part of the value of the land for and the cost of the installation and construction of any building, facility, structure, or other improvement which is publicly owned either within or without the project area, if the legislative body determines both of the following: [¶] (1) That the buildings, facilities, structures, or other improvements are of benefit to the project area or the immediate neighborhood in which the project is located, . . . [¶] (2) That no other reasonable means of financing such buildings, facilities, structures, or other improvements, are

available to the community. [¶] Those determinations by the agency and the local legislative body shall be final and conclusive. . . . [¶] When the value of the land or the cost of the installation and construction of the building, facility, structure, or other improvement, or both, has been, or will be, paid or provided for initially by the community or other public corporation, the agency may enter into a contract with the community . . . under which it agrees to reimburse the community . . . for all or part of the value of the land or all or part of the cost of the building, facility, structure, or other improvement, or both, by periodic payments over a period of years. [¶] The obligation of the agency under the contract shall constitute an indebtedness of the agency . . . , which indebtedness may be made payable out of taxes . . . allocated to the agency under subdivision (b) of Section 33670, or out of any other available funds."

It will be noted that the first paragraph generally authorizes an agency to pay for the construction cost and land value of publicly owned facilities which benefit the project area. Since it contains no reference to the source of the payments, we infer that the agency may make them out of any source of revenue authorized under the Community Redevelopment Law. The agency's authority to make the payments implies, we conclude, authority to enter into agreements governing the conditions of payment, including agreements with the local government which will own the public facility. The School Districts urge us to focus on the third paragraph, arguing that it provides the only effective authority for the use of tax increment funds under a contract with a public entity. We find, however, that this paragraph applies to the distinct circumstance where a "community or other public corporation" initially pays for the construction cost and land value of the public facility. In such cases, it authorizes the agency to enter into a contract with the public entity to reimburse it for these expenditures out of taxes allocated under section 33670 or "any other available funds." Though this provision contains the only reference to payment of tax increment funds pursuant to a contract, we do not read it as limiting in any way the general authorization in the first paragraph.

 Alternatively, the School Districts seek full judicial review of the Courthouse Agreement under two separate theories. First, they cite *Redevelopment Agency* v. *Herrold* (1978) 86 Cal.App.3d 1024, 1029 [150 Cal.Rptr. 621], as allowing a validating proceeding to challenge the legality of actions involved in "the implementation" of the redevelopment plan. The approval of the Courthouse Agreement, they argue, constitutes such "an attempt to implement the [redevelopment] Project plan." Without analyzing the *Herrold* decision more closely, we conclude that it has no application to the present

case. It is immaterial that the Courthouse Agreement may conceptually constitute an "implementation" of the redevelopment plan. Since it is a transaction resting on the authority of section 33445, it must be reviewed pursuant to the provisions of that statute.

■ Secondly, citing *Sweetwater Valley Civic Assn.* v. *City of National City* (1976) 18 Cal.3d 270 [133 Cal.Rptr. 859, 555 P.2d 1099], they argue that the language of section 33445 making the required findings "final and conclusive" does not apply to a validating proceeding. The *Sweetwater* plaintiff sought judicial review of a determination under section 33368 that certain property constituted a "blighted area." Section 33367 appeared to bar this judicial review; it provided: "The decision of the legislative body [adopting a redevelopment plan] shall be final and conclusive, and it shall thereafter be conclusively presumed that the project area is a blighted area . . . ." On the other hand, section 33501 appeared to specifically authorize judicial review through a validating proceeding, and section 33500 imposed a 60-day statute of limitations on such actions. Harmonizing these statutes, the court held that judicial review of the determination of blight "authorized by section 33501 is available provided it is sought within the 60-day period of section 33500, and that the conclusive presumption of section 33368 applies only to actions filed after the period has expired." (*Id.* at p. 277.)

■ The School Districts purport to bring the present action under the authority of section 33501. If that statute did in fact apply, the action would indeed bear a close analogy to the *Sweetwater* decision, presumably calling for the same conclusion. Section 33501 applies, however, only to matters associated with the issuance of bonds and the adoption of a redevelopment plan; thus, in pertinent part, it authorizes a validating proceeding "to determine the validity of bonds . . . or to determine the validity of a redevelopment plan . . . , including . . . [the] validity of all proceedings theretofore taken for or in any way connected with the establishment of the agency, its authority to transact business and exercise its powers, the designation of the survey area, the selection of the project area, the formulation of the preliminary plan, and the adoption of the redevelopment or renewal plan . . . ." Since the Courthouse Agreement does not actually call for the issuance of bonds and does not concern the adoption of a redevelopment plan, it is not subject to a validating proceeding under the provisions of section 33501.

■ The School Districts are instead authorized to bring the present action under Government Code section 53511. The statute must be read in the complex statutory context relating to validating proceedings. (Code Civ. Proc., pt. 2, tit. 10, ch. 9.) Code of Civil Procedure section 860 authorizes

public agencies to bring an action to determine the validity of their transactions within a 60-day period, but conditions the scope of this authority on other implementing legislation: "A public agency may upon the existence of any matter *which under any other law is authorized to be determined pursuant to this chapter,* and for 60 days thereafter, bring an action . . . to determine the validity of such matter." (Italics added.) Code of Civil Procedure section 863 gives "any interested person" a derivative right to bring an action if the public agency does not initiate validating proceedings. Code of Civil Procedure section 869 provides that the 60-day period of Code of Civil Procedure section 860 operates as a statute of limitations on such actions by interested persons.

Government Code section 53511 broadly authorizes a local agency to "bring an action to determine the validity of its bonds, warrants, *contracts,* obligations or evidences of indebtedness pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure." (Italics added.) The reference to "contracts" confers on the School Districts authority to bring the present action under Code of Civil Procedure section 860. The meaning of the term was exhaustively analyzed in *City of Ontario* v. *Superior Court* (1970) 2 Cal.3d 335, 342-344 [85 Cal.Rptr. 149, 466 P.2d 693]. The court noted that, while the statute does not expressly qualify the term, the legislative history and statutory context indicated that it does not apply generally to all municipal contracts but rather should be construed in pari materia with the other terms in the statute. Narrowly construed in this sense, the term still applies to contracts such as the Courthouse Agreement, that is, to financial obligations in "joint financing agreements" between local agencies. (*Id.* at p. 343.)

Returning to our point of departure—the *Sweetwater* decision—we find nothing in the analysis of that decision that should affect our interpretation of the "final and conclusive" language of section 33445. The provisions of Government Code section 53511 do not conflict with the provisions of section 33445 in a manner comparable to sections 33501 and 33368, the statutes at issue in the *Sweetwater* decision. ▮ Rather, Government Code section 53511 applies in general terms to "contracts" involved in municipal financing; section 33445 applies specifically to payments by a redevelopment agency for the construction cost and land value of public facilities. Under the principle that "when a special and a general statute are in conflict, the former controls" (*Stemler* v. *Workers' Comp. Appeals Bd.* (1988) 204 Cal.App.3d 577, 582 [251 Cal.Rptr. 364], internal quotation marks omitted), a validating proceeding under Government Code section 53511 should be subject to the "final and conclusive" language of section 33445.

The School Districts' arguments lead, however, to unresolved issues regarding judicial review of agency decisions under section 33445. The decisions, as we have seen, must be based on two required "determinations" by the agency and the "local legislative body" relating to benefit to the project area and the absence of other reasonable means of financing. Since the determinations relate to matters of fact, they are clearly equivalent to findings of fact. The statute states that the determinations shall be "final and conclusive." In analyzing the significance of this language, we begin with the distinction between adjudicative and legislative findings. ■ Adjudicative findings pertain to government " '. . . action affecting an individual [which is] determined by facts peculiar to the individual case' " (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 613 [156 Cal.Rptr. 718, 596 P.2d 1134]); legislative findings relate, among other things, to decisions regarding the management of governmental entities, including the appropriation and borrowing of "money for public purposes." (*Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 278 [63 Cal.Rptr. 889]; see also *Dominey* v. *Department of Personnel Administration* (1988) 205 Cal.App.3d 729, 736-737 [252 Cal.Rptr. 620].)

Although legislative determinations by local governments and administrative agencies are commonly subject to judicial review,[2] they do not present issues of procedural due process. (*San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 212 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973].) Accordingly, the Legislature is free to put the evidentiary basis for these legislative decisions beyond judicial review. (*People* v. *Chevalier* (1959) 52 Cal.2d 299, 307 [340 P.2d 598].) As stated in *Association of Nat. Advertisers, Inc.* v. *F. T. C.* (D.C. Cir. 1979) 627 F.2d 1151, 1166 [201 U.S.App.D.C. 165, 51 A.L.R.Fed. 335], "Congress is under no requirement to hold an evidentiary hearing prior to its adoption of legislation, and 'Congress need not make that requirement when it delegates the task to an administrative agency.' "

■ The two determinations required by section 33445 clearly fall within the category of legislative findings. We read the provision making the determinations "final and conclusive" to mean that the evidentiary basis for the findings is beyond the reach of judicial scrutiny; the courts may not inquire whether the findings are supported by substantial evidence or by any evidence at all in the administrative record. This conclusion, however, does

---

[2]See Code of Civil Procedure section 1245.255, subdivision (b) (determination of necessity in condemnation action); Government Code section 11350 (rulemaking under the Administrative Procedure Act); *Heist* v. *County of Colusa* (1984) 163 Cal.App.3d 841, 846 [213 Cal.Rptr. 278] (standard of review of quasi-legislative actions under ordinary mandamus).

not preclude judicial review of the procedures followed by the agency and the local legislative body in making the determinations or of the question whether the determinations comply with section 33445.

It is highly significant, we think, that section 33445 requires not only that the local legislative body consent to the tax increment financing of public facilities but also that it make the two required determinations of fact. Clearly, the Legislature intended the two required determinations to represent something beyond mere *consent* to the financing. The legislative history underscores this observation.

As originally enacted, section 33445 required only the consent of the legislative body. (Stats. 1965, ch. 1665, § 36, p. 3786.) In 1970, it was amended to require the legislative body both to consent and to make a "determination by resolution" that the public facility would benefit the redevelopment area. (Stats. 1970, ch. 1238, § 1.7, p. 2227.) A 1976 amendment added the second determination regarding "other reasonable means of financing" and revised the language to state plainly that the two determinations were a condition to the power of the agency to engage in the tax increment financing. (Stats. 1976, ch. 1336, § 13, p. 6060.)

The basis for legislative concern is clear. A redevelopment project may last for a period of decades. With historical rates of inflation continuing over this length of time, tax increment financing may gradually give the redevelopment agency a claim over most of the aggregate tax base. Yet, the city or county, sponsoring the agency, may otherwise be entitled to only a relatively small portion of the property tax revenues. "An observer of the California system has noted that while cities are in total control of their redevelopment projects, their portion of property taxes collected is generally less than one-quarter of the total tax collected. The remaining three-quarters are captured by another taxing agency that has no control over the project. In other words, cities using tax increment financing are free to gamble with the future tax bases of other taxing entities within their purview." (Lefcoe, *When Governments Become Land Developers: Notes on the Public-Sector Experience in the Netherlands and California* (1978) 51 So.Cal.L.Rev. 165, 258.)

█ In short, our review of the statutory context and legislative history indicates that the Legislature intended that the two required determinations of section 33445 effectively limit potential abuses in tax increment financing. We must construe the statute in a manner that gives substance to this legislative intent. This means that the determinations should be made following public hearing of the "legislative body" complying with section

33679, the Ralph M. Brown Act (Gov. Code, § 54950 et seq.), and other applicable law governing the adoption of resolutions of this kind. The resolution of the City Council in fact recites that public hearing was held "for the purpose of receiving public [input] and comment on the proposed agreement."

The record, however, reveals an extraordinary anomaly: the *City* made a finding on the *County's* finances. In its resolution (No. 90-583) dated July 17, 1990, consenting to the Courthouse Agreement, the City Council resolved: "Based further on the information received at the public hearing and in the Agency's summary report, the City Council hereby further determines that no other reasonable means of financing such building, facility, or structure are available to the community." Since the City did not plan to finance construction of the County Courthouse, and would lack legal power to do so, the resolution can only represent a finding that the County possessed "no other reasonable means" of financing construction of its principal administrative building.

■ The resolution was perhaps based on a literal reading of section 33445 which states simply that the two required determinations may be made by "the legislative body." By using the term in the singular, the Legislature apparently anticipated that the same legislative body would be competent to make both determinations—the public facility's "benefit to the project area" and the absence of "other reasonable means of financing." But in the case of a county building constructed within city limits, the city and the county are each qualified to make only one of the determinations. The city is competent to make a finding on the benefit to an area within its jurisdiction but has no warrant to delve into the finances of another governmental entity; the county can speak to its own finances but has no jurisdiction over urban planning within city limits.

■ "[T]he paramount goal of statutory interpretation is ascertainment of the legislative intent in order to effectuate the objectives of the law." (*Poppers* v. *Tamalpais Union High School Dist.* (1986) 184 Cal.App.3d 399, 403 [229 Cal.Rptr. 77].) "The intent to create such an illogical and confusing scheme cannot be attributed to the Legislature. In fact, it is a duty of the courts to construe statutes so as to avoid such an absurd result, if possible." (*Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 153 [23 Cal.Rptr. 592, 373 P.2d 640].) "Once a particular legislative intent has been ascertained, it must be given effect ' "even though it may not be consistent with the strict letter of the statute." ' " (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d

1049].) ██ Under these principles, we hold that the term "legislative body" in 33445 can be most reasonably construed to refer to the legislative body affected by the factual determination. Despite the use of the term in the singular, if the two required determinations affect different legislative bodies, each must make a finding on the matter that concerns it.[3] Here, the City must make a determination on the benefit to the project area and the County must make the required finding on the unavailability of other means of financing.

The resolution contains another anomaly: the Courthouse Agreement, which the City Council regarded as the only "reasonable means" of financing the courthouse, does not provide for any particular form of financing. It states only that the Agency shall use the tax increment set aside under section 33670 "for the purpose of assisting the County in financing the costs for plans and specifications and construction for a new County courthouse and other Agency approved County public facilities consistent with the Redevelopment Plan." The Courthouse Agreement does not state whether the Agency will pay for part or all of the cost of the courthouse or other unidentified "County public facilities," whether it will make the initial payments to finance the facilities or reimburse the County for its costs, whether bonds will be issued and, if so, whether they will be long or short term, or whether the financing will rest solely on the Agency's credit or will be supported by a lease or other agreement between the Agency and the County. In short, the Courthouse Agreement provides only that the Agency will assist the County in financing the construction of the courthouse and other public facilities in a manner to be agreed upon in the future.

It is, of course, entirely proper for the Agency and the County to enter into a vaguely worded statement of intent. Though containing no enforceable obligations, statements of this kind may have a useful political purpose. But this appeal concerns compliance with section 33445. ██ A determination that an unidentified form of financing constitutes the only "reasonable means" of financing a County building is plainly meaningless; it cannot serve any useful function in guiding and limiting the use of tax increment financing for public facilities. Since it does not serve the intended purpose of the statutory requirement, it may fail to qualify as a determination of fact demanded by section 33445.

We now consider the precise issue on appeal: whether the trial court erred in sustaining without leave to amend the demurrer to the second and third causes of action in the first amended complaint. The trial court sustained the

---

[3]In such case, each legislative body must separately comply with section 33679.

demurrer on the ground the allegations of the second cause of action were "purely conclusionary" and that the third cause of action was barred by the language of section 33445 providing that the "determinations by the agency and the local legislative body shall be final and conclusive." To review the propriety of the ruling, we must first consider the pleading requirements for a validating proceeding.

■■■ Under Code of Civil Procedure, section 860, a public agency bringing a validating proceeding clearly need allege no more than an action by a public agency of a type subject to the validating proceeding, plus facts on which venue is based. Code of Civil Procedure sections 863 and 869 explicitly impose two additional requirements on third parties bringing such an action: they must allege standing as an "interested party" and that the public agency's action was taken within 60 days of filing. School Districts contend that they were subject to no more extensive pleading requirements; thus, despite its flaws, the amended complaint sufficed to state a cause of action. The defendants contend that a third party complaint seeking to challenge a public agency's action through a validating proceeding must allege the defect in the agency's action on which the challenge is based; since the complaint did not identify a legal defect, it did not state a cause of action.

As a matter of judicial policy we conclude that a third party complaint in a validating proceeding should allege the defect on which the challenge to the public agency's action is based. Such an allegation of an asserted legal defect is necessary to give the public agency fair notice to prepare its defense. Though the question is one of first impression, a number of decisions have assumed in dicta or in their disposition of the issues that such an allegation of a particular defect is required. (*Redevelopment Agency* v. *Superior Court* (1991) 228 Cal.App.3d 1487 [279 Cal.Rptr. 558]; *Committee for Responsible Planning* v. *City of Indian Wells* (1990) 225 Cal.App.3d 191, 198 [275 Cal.Rptr. 57]; *Moorpark Unified School Dist.* v. *Superior Court* (1990) 223 Cal.App.3d 954, 959 [273 Cal.Rptr. 18]; *Fosselman's, Inc.* v. *City of Alhambra* (1986) 178 Cal.App.3d 806, 813 [224 Cal.Rptr. 361]; *Beck* v. *County of San Mateo* (1984) 154 Cal.App. 3d 374 [201 Cal.Rptr. 365].)

Nevertheless, we consider that a trial court should exercise caution in dismissing a validating proceeding on the pleadings. The relief sought in such a proceeding is merely a judgment adjudicating the validity of an act of a public agency based on judicial review of the administrative record. The trial before the court is a relatively straight forward matter, involving introduction of the administrative record pertinent to the action to be adjudicated. Given the unique nature of the proceedings, the trial court should

ordinarily grant relief on the basis of the record itself, rather than on allegations about the record.

In their original and first amended complaint, School Districts challenged the Courthouse Agreement by raising broad issues of statutory interpretation. ██ As we have seen, the trial court correctly determined that this legal challenge lacked merit. But by sustaining respondents' demurrer without leave to amend, the court foreclosed any examination of the actual administrative record. To this extent, we consider that the court abused its discretion in denying School Districts' leave to amend. Nothing in the School Districts' filings indicated that they conceded the regularity of the administrative proceeding or that the proceedings were beyond attack. To the contrary, the filings on demurrer included the City Council resolution displaying the egregious flaws discussed above.

The defendants, however, raise two objections. ██ First, they raise a novel theory that the action is partially barred by the 60-day limitation of Code of Civil Procedure sections 860 and 869. They concede that the complaint was filed within 60 days after adoption of the Courthouse Agreement; but they contend that, in reviewing the administrative record pertaining to the Courthouse Agreement, the court must refrain from considering the validity of any action taken more than 60 days before the filing of the complaint; specifically, it must not question the validity of the resolutions of the Agency and City Council on July 17, 1990, that made the two determinations required by section 33445. No doubt, a validating proceeding may not be used as a springboard to delve into the history of a public agency, but we have no hesitation in concluding that, where the proceeding pertaining directly to a challenged action extends beyond the 60-day period of limitations, the court may review the entire record of the proceeding in adjudicating the validity of the action.

██ Secondly, the defendants maintain that the School Districts do not have standing to challenge the Courthouse Agreement in a validating proceeding. The School Districts, however, are "affected taxing entities" (see § 33353.2) whose future tax base may be limited by implementation of the Courthouse Agreement. Accordingly, they constitute "interested persons" within the meaning of Code of Civil Procedure section 863.

██ Lastly, we hold that the trial court properly sustained demurrers without leave to amend to the first and fourth causes of action alleging violation of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.). The School Districts earlier filed a timely action to set

aside the redevelopment plan for failure to comply with this act. In that action, they may challenge the adequacy of the environmental impact report as it relates to the proposed building. The Courthouse Agreement, however, is not subject to separate challenge. Under Public Resources Code section 21090, "all public and private activities or undertakings pursuant to or in furtherance of a redevelopment plan shall be deemed a single project." In addition, such a separate challenge would now be barred by the 30-day limitation of Public Resources Code section 21167. The School Districts have failed to allege facts that might require preparation of a subsequent environmental impact report relating to the Courthouse Agreement. (See *Environmental Law Fund, Inc.* v. *City of Watsonville* (1981) 124 Cal.App.3d 711, 714 [177 Cal.Rptr. 542].)

The judgment is reversed insofar as it dismisses the second and third causes of action and in all other respects is affirmed. Costs to appellants.

Strankman, P. J., and Stein, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 20, 1993.