Filed 1/16/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF EMERYVILLE et al., | C074186 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34201280001264CUWMGDS) |
| v. | |
| MICHAEL COHEN, as Director, etc. | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Affirmed.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Marc A. LeForestier, Deputy Attorney General, Ryan Marcroft, Deputy Attorney General, for Defendant and Appellant.

Michael G. Biddle, City Attorney; and Burke, Williams & Sorensen, J. Leah Castella, Matthew D. Visick, for Plaintiffs and Respondents.

1

The factual and legal setting of this case is complex, involving the Legislature's decision to dissolve the many redevelopment agencies which became a fixture of local government financing over decades, and involving the way the moneys remaining in the redevelopment agency coffers around the state would be redistributed.

But the narrow dispute on appeal turns on the straightforward interpretation of a few statutes. As the trial court correctly reasoned, those statutes authorized plaintiffs City of Emeryville and Successor Agency to the Emeryville Redevelopment Agency (collectively, Emeryville) to "reenter" into three agreements entered into *before* the dissolution of redevelopment agencies. And, contrary to the view of defendant California Department of Finance (Department), nothing in the statutory scheme providing for the orderly distribution of redevelopment funds subsequently invalidated these reentered agreements. Accordingly, we shall affirm the judgment, which in effect compels the Department to acknowledge the validity of those agreements.

## BACKGROUND

*General Legal Background*

As briefly summarized by our Supreme Court: "In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay. [Citations.] The Community Redevelopment Law 'was intended to help local governments revitalize blighted communities.' [Citations.] It has since become a principal instrument of economic development, mostly for cities, with nearly 400 redevelopment agencies now active in California." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245-246 (*Matosantos*).)

However, as our Supreme Court explained, a perception had grown that some redevelopment agencies were used as shams to divert property tax revenues that otherwise would fund general local governmental services, and legislative efforts were made to address these concerns. (*Matosantos*, *supra*, 53 Cal.4th at pp. 247-248; see *Meaney v. Sacramento Housing & Redevelopment Agency* (1993) 13 Cal.App.4th 566,

2

579.)  Ultimately, a more draconian measure was adopted by the Legislature: "Responding to a declared state fiscal emergency, in the summer of 2011 the Legislature enacted two measures intended to stabilize school funding by reducing or eliminating the diversion of property tax revenues from school districts to the state's community redevelopment agencies.  (Assem. Bill Nos. 26 & 27 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (hereafter Assembly Bill 1X 26 and Assembly Bill 1X 27).)  Assembly Bill 1X 26 bars redevelopment agencies from engaging in new business and provides for their windup and dissolution.  Assembly Bill 1X 27 offers an alternative: redevelopment agencies can continue to operate if the cities and counties that created them agree to make payments into funds benefiting the state's schools and special districts."  (*Matosantos*, *supra*, 53 Cal.4th at p. 241.)

Our Supreme Court invalidated Assembly Bill 1X 27, because it conflicted with a provision of the California Constitution forbidding the payments required thereunder.  (*Matosantos*, *supra*, 53 Cal.4th at pp. 242, 264-274.)  Following that decision, the only lawful option for redevelopment agencies was windup and dissolution, as provided by Assembly Bill 1X 26, set forth in the Health and Safety Code, although *Matosantos* judicially reformed certain dates in Assembly Bill 1X 26 to best effectuate the Legislature's intent.  (*Matosantos*, at pp. 274-276.)

*The Principal Statutes in Contention*

Assembly Bill 1X 26 provided that successor agencies would "[e]xpeditiously wind down the affairs of the redevelopment agency pursuant to the provisions of this part and in accordance with the direction of the oversight board."  (Health & Saf. Code, § 34177, subd. (h).)[1]  Each oversight board consists of members appointed as set forth by statute (§ 34179, subd. (a)), and has a fiduciary duty towards "holders of enforceable

---

[1] Further undesignated statutory references are to the Health and Safety Code.

3

obligations and the taxing entities that benefit from distributions of property tax" (§ 34179, subd. (i)) to carry out its duties, which include the duty to review specified actions by the successor agencies, including "Establishment of the Recognized Obligation Payment Schedule [ROPS]." (§ 34180, subd. (g).) The ROPS is "the document setting forth the minimum payment amounts and due dates of payments required by enforceable obligations for each six-month fiscal period . . . ." (§ 34171, subd. (h).) The successor agency has a duty to "[c]ontinue to make payments due for enforceable obligations." (§ 34177, subd. (a).) Thus, to help insure the orderly windup and dissolution of the redevelopment agencies, the ROPS lists what remaining enforceable obligations exist.

To ensure each ROPS is accurate, both the Department and the State Controller, not a party herein, have the authority to require documentation of purported enforceable obligations, and they and any "taxing entity" have authority to sue "to prevent a violation under this part . . . ." (§ 34177, subd. (a)(2).) The Department also has authority to "review an oversight board action taken pursuant to" Assembly Bill 1X 26. (§ 34179, subd. (h).)

Under Assembly Bill 1X 26, section 34178, subdivision (a) provided as follows:

> "Commencing on the operative date of this part, agreements, contracts, or arrangements between the city or county, or city and county that created the redevelopment agency and the redevelopment agency are invalid and shall not be binding on the successor agency; provided, however, that *a successor entity wishing to enter or reenter into agreements with the city, county, or city and county that formed the redevelopment agency that it is succeeding may do so upon obtaining the approval of its oversight board*." (Italics added.)

Further, section 34180, subdivision (h) requires oversight board approval of a request by a successor agency to enter into such an agreement.

However, effective June 27, 2012, Assembly Bill No. 1484 (Stats. 2012, ch. 26, § 14) (hereafter Assembly Bill 1484) added the following sentence to section 34178, subdivision (a):

4

"A successor agency or an oversight board shall not exercise the powers granted by this subdivision to restore funding for an enforceable obligation that was deleted or reduced by the [Department] pursuant to subdivision (h) of Section 34179 unless it reflects the decisions made during the meet and confer process with the [Department] or pursuant to a court order." (§ 31478, subd. (a), as amended by Stats. 2012, ch. 26, §§ 14, 40.)[2]

Assembly Bill 1484 made other significant changes as well. Originally, section 34179, subdivision (h) in part provided, "The Department . . . may review an oversight board action taken pursuant to the act adding this part. *As such, all oversight board actions shall not be effective for three business days*, pending a request for review" by the Department, and upon such review, the Department had "10 days from the date of its request *to approve the oversight board action or return it to the oversight board for reconsideration and such oversight board action shall not be effective until approved by the department*." (Stats. 2011-2012, 1st Ex. Sess., ch. 5, § 7, italics added.) Assembly Bill 1484 delayed the effective date of oversight board action for five days, gave the Department 40 days to review such action, and provided that, upon such review, the Department "may eliminate or modify any item on that schedule prior to its approval" and "shall provide notice . . . as to the reasons for its actions." (§ 34179, subd. (h), as amended by Stats. 2012, ch. 26, §§ 16, 40.)

Assembly Bill 1484 also added new section 34177.3, providing in part as follows:

"(a) Successor agencies shall lack the authority to, and shall not, create new enforceable obligations . . . or begin new redevelopment work, except in compliance with an enforceable obligation that existed prior to June 28, 2011 [i.e., before the effective date of Assembly Bill 1X 26].

"(b) Successor agencies may create enforceable obligations to conduct the work of winding down the redevelopment agency . . . .

---

[2] Assembly Bill 1484 was related to a budget bill, and took effect when signed. (Stats. 2012, ch. 26, § 40; see Cal. Const., art. IV, § 12, subd. (e).) Assembly Bill 1X 26, too, was budget related, and was signed June 28, 2011. (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 16.)

"(c)  Successor agencies shall lack the authority to, and shall not, transfer any powers or revenues of the successor agency to any other party, public or private, except pursuant to an enforceable obligation on a [ROPS] approved by the department.  Any such transfers of authority or revenues that are not made pursuant to an enforceable obligation on a [ROPS] approved by the Department of Finance are hereby declared to be void, and the successor agency shall take action to reverse any of those transfers. . . .

"(d)  . . .  Any actions taken by redevelopment agencies to create obligations after June 27, 2011, are ultra vires and do not create enforceable obligations.

"(e)  The Legislature finds and declares that the provisions of this section are declaratory of existing law."  (Stats. 2012, ch. 26, § 12.)

*Emeryville's Redevelopment Projects*

On February 15, 2011 (before Assem. Bill 1X 26 had passed), Emeryville and its redevelopment agency had entered into a contract under which the agency pledged funds to Emeryville for redeveloping 27 projects.  Emeryville realized that contract was subsequently invalidated by Assembly Bill 1X 26--specifically, the first clause of section 34178, subdivision (a).  However, it also realized that the statute also provided that "a successor entity wishing to enter or reenter into agreements with the city . . . that formed the redevelopment agency that it is succeeding may do so upon obtaining the approval of its oversight board."  (§ 34178, subd. (a).)

On June 19, 2012, Emeryville and the successor agency executed five agreements, restating the provisions as to five of the original projects, and on June 26, 2012 (one day prior to the effective date of Assembly Bill 1484, discussed immediately above, and purportedly under the earlier, Assembly Bill 1X 26 version of section 34178, subdivision (a)), its oversight board approved three of these five agreements.[3]  These agreements

---

[3]  As the details and wisdom of these projects are not relevant to the issues on appeal, we will not discuss them.  Although the Department heads a section of its brief detailing each

6

were included in an amended ROPS submitted on June 28, 2012, the day *after* Assembly Bill 1484 passed. On July 3, 2012, three business days later, the Department told Emeryville it was reviewing the ROPS. On July 12, 2012, it sent a letter to all successor agencies stating it would not accept ROPS revisions and rejected Emeryville's amended ROPS. The trial court found that this action effectively disapproved the agreements.

*The Present Litigation*

Emeryville sued the Department, seeking to compel the Department to recognize the enforceability of the three reentered agreements, filing a combined petition for writ of administrative mandamus and complaint for declaratory and injunctive relief. The trial court issued a thorough written opinion in favor of Emeryville, and granted relief in a formal judgment and writ of mandamus.[4]

The Department timely filed this appeal therefrom.

## DISCUSSION

The original Assembly Bill 1X 26 statutes appeared to authorize Emeryville to reenter into the agreements at issue, subject to approval by the oversight board and review by the Department. Emeryville obtained approval by its oversight board for the agreements, which, when so approved, were valid unless disapproved by the Department. If disapproved, the Department was to "return [the ROPS] to the oversight board for reconsideration" within 10 days. (Former § 34179, subd. (h), added by Stats. 2011-2012,

---

project, we reject its given reasons for invalidating each in Parts I and II of the Discussion, *post*.

[4] The trial court found the question of the validity of the three *prior* agreements was moot "because the subject matter of those agreements was subsumed into" the three *reentered* agreements validated by the trial court. The parties evidently agree that any issues surrounding the prior agreements are moot if we uphold the three reentered agreements.

7

1st Ex. Sess., ch. 5, § 7.) In this case, the Department did not substantively disapprove the amended ROPS, it simply refused to process it, claiming it was untimely.[5]

We note that the Department asserts the reentered agreements covered the subject matter of agreements disapproved in an earlier ROPS submission, but agrees they had "new and different terms." The Department's point seems to be that they were not merely reentered but *different* agreements. However, the Department does not articulate any *material* differences, and it was the Department's burden to explain any basis for reversal on which it seeks to rely. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; see also *Estate of Palmer* (1956) 145 Cal.App.2d 428, 431.)

The Department suggests throughout its briefing that Emeryville acted with improper motives by rushing these agreements through with knowledge of a pending legislative change. However, "It is presumed that official duty has been regularly performed." (Evid. Code, § 664; see *Crowe v. Boyle* (1920) 184 Cal. 117, 156; *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533,

---

[5] In its opposition in the trial court, the Department briefly argued--without citing authority--that the amended ROPS was properly rejected because it was untimely. That theory has not been raised on appeal. We find it has been abandoned. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, pp. 769-771.)

We have recently commented on the importance of seeking the proper form of relief in disputes about the dissolution of redevelopment agencies. (See *City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461.) Here, once the Department issued its blanket notification that it was refusing to consider any revised ROPS, Emeryville arguably should have filed a petition for writ of *ordinary* mandate (Code Civ. Proc., § 1085), to compel the Department to exercise its duty to process the revised ROPS on the merits, and await its discretionary decision. But the Department does not claim on appeal that section 34179, subdivision (h) ["oversight board action shall not be effective until approved by the department"] means that the ROPS *never* became effective, and, as stated, does not provide any statutory or regulatory authority to defend its prior stance that it could refuse to consider all revised ROPS as untimely. Accordingly, even if Emeryville failed to properly seek relief, remand would be an idle act (cf. Civ. Code, § 3532), because the Department's present stance is that the obligations at issue on the revised ROPS are legally infirm, and therefore it would refuse to approve them.

548.)  Even assuming, as the State alleges, that the oversight board disregarded legal advice, as an elected body it was free to do so.  Nor is it necessarily sinister for a party to hasten to comply with a law before adverse changes occur.  Finally, as the trial court explicitly found, the oversight board thoroughly debated the issues, and approved only three of the five agreements submitted to it, showing discretion was actually exercised.

Essentially, the Department's arguments boil down to two claims.  First, the Department asserts that the statute allowing reentry of certain agreements, section 34178, is too narrow to encompass the three agreements here, because of certain statutory arguments we address in more detail in Part I, *post*, and because of the policy inherent in Assembly Bill 1X 26.  Second, the Department claims that Assembly Bill 1484--passed after Emeryville reentered the three agreements--had *retrospective* effect, including section 34177.3, quoted above.  Emeryville conceded in the trial court and appellate briefing that this claim, if correct, would invalidate those agreements.  As we shall explain, we are not persuaded by either of the Department's claims.

I

*Emeryville's Legal Authority to Reenter into the Agreements*

Citing various parts of Assembly Bill 1X 26 and its general goal, the Department asserts section 34178, subdivision (a) did not authorize Emeryville to reenter into the agreements at issue herein.  We hold the statute unambiguously allowed Emeryville to do what it did.

First, the Department's policy claim cites several disparate sections of Assembly Bill 1X 26 to establish the Legislature's desire to halt redevelopment agency activity and freeze existing assets.  But an uncodified statement of legislative intent *explicitly* sets forth the purposes of Assembly Bill 1X 26, which included barring "existing redevelopment agencies from incurring new obligations," and requiring "successor agencies to expeditiously wind down the affairs of the dissolved redevelopment agencies and to provide the successor agencies with limited authority that extends only to the

9

extent needed to implement a winddown of redevelopment agency affairs." (Stats. 2011-2012, 1st Ex. Sess., ch. 5, § 1, subd. (j)(1) & (4).) Our Supreme Court validated Assembly Bill 1X 26's purpose in these regards. (See *Matosantos*, *supra*, 53 Cal.4th at pp. 254-262.)

But this general legislative purpose was implemented through specific statutes, including section 34178, statutes that must be effectuated. "The will of the Legislature must be determined from the statutes; intentions cannot be ascribed to it at odds with the intentions articulated in the statutes." (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182.) "[T]he meaning of a statute is to be sought in the language used by the Legislature." (*In re Miller* (1947) 31 Cal.2d 191, 198.) We see nothing in the undisputed policy of section Assembly Bill 1X 26 to dissolve redevelopment agencies that changes the language of section 34178, or raises any latent ambiguity therein. (See *People* v. *Snook* (1997) 16 Cal.4th 1210, 1215 ["If there is no ambiguity in the language, we presume the Legislature meant what it said"]; *Brown v. Gardner* (1994) 513 U.S. 115, 118 [130 L.Ed.2d 462, 466] ["Ambiguity is a creature not of definitional possibilities but of statutory context"].) "An ambiguity arises only if 'there [is] more than one construction in issue which is semantically permissible, i.e., more than one usage which makes sense of the statutory language given the context and applicable rules of usage.' " (*City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 795 (*Sacramento*).)

The Department's reading of section 34178 as excluding the authority to maintain existing redevelopment projects by means of reentering into agreements providing therefor is not plausible, because it nullifies the language permitting a successor agency to "enter or *reenter*" contracts. As the trial court reasoned: "The concept of 'reentering' into an agreement presupposes the existence of a prior agreement, in this case an agreement between the former Redevelopment Agency and the City." Thus, section 34178 was intended to allow *prior* agreements to be *re*entered, subject to oversight board

10

approval, and possible review by the Department. Nowhere in its briefing does the Department tender an alternate meaning of "reenter." Instead, its briefing reads that word out of the statute. We reject that course. "An interpretation which gives effect is preferred to one which makes void." (Civ. Code, § 3541.) " 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose[;]' [citation] 'a construction making some words surplusage is to be avoided.' " (*Moyer v. Workmen's Comp. Appeals Bd*. (1973) 10 Cal.3d 222, 230.)

The Department cites a number of specific statutes in its effort to restrict the scope of the authority to reenter into agreements under section 34178, but none raise an ambiguity in the meaning of "reenter." For example, one section prevents redevelopment agencies from incurring or expanding monetary obligations, but contains the proviso "except as provided in this part." (§ 34161.) Other statutes would preclude incurring debt or new obligations. (§§ 34162, 34163.) Nor were successor agencies to take any actions "that would further deplete the corpus of the agencies' funds." (§ 34167, subd. (a).) Asset transfers between a redevelopment agency and its organic body after January 1, 2011, were to be restricted "to the extent not prohibited by state and federal law," and any such transfer was "deemed not to be in furtherance of the Community Redevelopment Law and is thereby unauthorized." (§ 34167.5.) Most agreements between former redevelopment agencies and their organic bodies were invalidated (§ 34178, subd. (a)), as Emeryville conceded. A definitional section provides: "For purposes of this part, 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency." (§ 34171, subd. (d)(2).)

As the Department explains, these provisions facilitate the dissolution and winddown of the redevelopment agencies. But none of these statutes, individually or collectively, change the fact that in the very same bill, Assembly Bill 1X 26, the Legislature explicitly authorized successor agencies to enter or *reenter* into agreements,

11

subject to approval by oversight boards.  And Emeryville points to a statute that partly defines one kind of enforceable agreement as:  "Any legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy."  (§ 34171, subd. (d)(1)(E).)[6]  Emeryville plausibly reads these statutes together to provide a limitation on the types of agreements that may be reentered.  This undermines the Department's argument that if section 34178 allows reentry of *some* redevelopment agreements, *all* redevelopment agreements could be reentered, undermining the point of Assembly Bill 1X 26.  Emeryville concedes it could not reconstitute its redevelopment agency because that would violate the public policy behind the dissolution statute, in contravention of section 34171, subdivision (d)(1)(E).  Further, section 34179, subdivision (i) imposes a fiduciary duty on oversight boards "to holders of enforceable obligations and the taxing entities that benefit from distributions of property tax . . . ."  Finally, the Department, the State Controller, and any adversely affected taxing entity can sue the oversight board for a violation of such fiduciary duty.  Thus, the scenario posited by the Department has no basis in the law or reality.

The Department also makes the more nuanced claim that section 34178 refers to a very narrow class of agreements capable of being reentered, and that the three at issue here fall outside its ambit.  The Department points out that section 34178, subdivision (b) explicitly authorizes three types of agreements--none like the ones at issue in this case.  But that subdivision begins, "Notwithstanding subdivision (a), any of the following agreements are not invalid and may bind the successor agency," and then lists three types

[6]  We note that although Assembly Bill 1484 amended parts of section 34171, the language we quote in this opinion was not changed.  (See Stats. 2012, ch. 26, § 6.)  In its reply brief, the Department contends section 34171, subdivision (d)(1), which defines "enforceable obligations," defines enforceable obligations *of the redevelopment agencies, not the successor agencies*--with one exception pertaining to administrative expenses-- and therefore has no relevance to the scope of section 34178.  We see no such limitation in section 34171, subdivision (d)(1).

of agreements. (§ 34178, subd. (b).)[7] That is not language of limitation, i.e., language *limiting* subdivision (a)'s authority (to reenter into agreements) to those agreements specified in subdivision (b), but language of enlargement, permitting additional agreements. As we read the statute, in addition to agreements permitted by subdivision (a), subdivision (b) lists other agreements--"[n]otwithstanding subdivision (a)"--that "may bind the successor agency." This language does not raise any ambiguity about the meaning of the word reenter as used in subdivision (a) of section 34178.

The Department also notes two sections permitting loans from a county treasury "necessary to ensure prompt payments of redevelopment agency debts" (§ 34183, subd. (c)), and agreements necessary to operate the successor agency, such as rent, equipment, and supplies (§ 34171, subd. (d)(1)(F)), and contends those are the *only* agreements that could be reentered under section 34178, subdivision (a). The Department then proceeds to posit that if Emeryville's view of the breadth of section 34178 were correct, there would be no need to describe specific agreements. We disagree. The fact that a county treasurer is vested with authority to loan funds to pay a redevelopment agency's enforceable debt does not equate to an enforceable agreement, nor does the provision authorizing agreements to pay administrative expenses of *successor* agencies address *reentered* agreements.

---

[7] Section 34178, subdivision (b) partly provides: "Notwithstanding subdivision (a), any of the following agreements are not invalid and may bind the successor agency: [¶] (1) A duly authorized written agreement entered into at the time of issuance, but in no event later than December 31, 2010, of indebtedness obligations . . . . [¶] (2) A written agreement between a redevelopment agency and the city . . . that created it that provided loans or other startup funds for the redevelopment agency that were entered into within two years of the formation of the redevelopment agency. [¶] (3) A joint exercise of powers agreement in which the redevelopment agency is a member . . . . However, upon assignment to the successor agency . . . the successor agency's rights, duties, and performance obligations under that joint exercise of powers agreement shall be limited by the constraints imposed on successor agencies by the act adding this part."

13

Finally, although the Department asserts the reentered agreements "flatly contradict other winddown provisions," no citations follow this assertion, so we have no other specific sections to address to refute the Department's contention that Emeryville's reentered agreements violate Assembly Bill 1X 26, in letter or spirit.[8]

Instead, as the trial court found, by enacting section 34178, subdivision (a), the Legislature provided a means to continue *some* redevelopment work, and the bulwark against abuse is vested in the oversight board, subject to review by the Department. Although the Department timely invoked its authority (§ 34179, subd. (h), as adopted by Assem. Bill 1X 26), thereafter, it did not give Emeryville substantive grounds for denying the enforceability of the reentered agreements, nor return the matter "for reconsideration" (*ibid*.), but deemed the amended ROPS untimely and invalid therefor, a position abandoned on appeal. (See fn. 5, *ante*.)

Accordingly, we reject the Department's claim that section 34178 is limited either by the general purpose of Assembly Bill 1X 26, or any of the specific statutes cited to us.[9]

---

[8] Elsewhere in its briefing, while attacking each reentered agreement in turn, the Department points to section 34177, subdivision (d), which requires a successor agency to "[r]emit unencumbered balances of redevelopment agency funds to the county auditor-controller for distribution to the taxing entities." This presupposes the balances are unencumbered and adds nothing to the Department's claim that section 34178 is severely limited. Similarly, the fact the reentered agreements in part cited a statute (§ 33445) made inoperative by Assembly Bill 1X 26 (see § 34189, subd. (a)), does not change the scope of section 34178.

[9] As described by our Supreme Court, Assembly Bill 1X 27 (passed in tandem with Assembly Bill 1X 26), provided "an exemption from dissolution for cities and counties that agree to make specified payments to both the county [Education Revenue Augmentation Fund] and a new county special district augmentation fund on behalf of their redevelopment agencies" which would allow such agencies "to continue in operation without interruption." (*Matosantos*, *supra*, 53 Cal.4th at p. 251.) The parties have not briefed whether the *anticipated* ability of redevelopment agencies to continue in

14

## II

*Retrospectivity of Assembly Bill 1484*

The Department contends that a portion of Assembly Bill 1484 retrospectively invalidated the reentered agreements. We disagree.

As quoted earlier, section 34177.3, subdivision (c) partly provides that, "Successor agencies shall lack the authority to . . . transfer any powers or revenues of the successor agency to any other party . . . except pursuant to an enforceable obligation on a [ROPS] approved by the department. Any such transfers of authority or revenues that are not made pursuant to an enforceable obligation on a [ROPS] approved by the [Department] are hereby declared to be void." Subdivision (a) of section 34177.3 precludes "new redevelopment work," except as to enforceable obligations that existed before Assembly Bill 1X 26 took effect. Subdivision (d) partly provides: "Any actions taken by redevelopment agencies to create obligations after June 27, 2011, are ultra vires and do not create enforceable obligations." Subdivision (e) provides: "The Legislature finds and declares that the provisions of this section are declaratory of existing law." (See Stats. 2012, ch. 26, § 12.)

Emeryville acknowledges section 34177.3, subdivision (c) grants the Department veto authority over any obligation included in a ROPS. The Department contends it does not matter that Emeryville reentered the three agreements *before* Assembly Bill 1484 passed, because the bill permits the Department to refuse to recognize as enforceable any agreements between a successor agency and another party.

We reject the Department's view that Assembly Bill 1484 has such retrospective effect.

---

this fashion sheds light on the interpretive questions posed by this appeal, and we decline to explore such possibilities in this opinion.

As summarized by our Supreme Court: " 'Generally, statutes operate prospectively only.' [Citations.] '[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . . For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." ' [Citations.] 'The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.' " (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475 (*McClung*).)

The general rule is that a " 'statute may be applied retroactively only if it contains express language of retroactivity *or* if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application.' " (*McClung*, *supra*, 34 Cal.4th at p. 475.) Here, Assembly Bill 1484 does not state that it is to be applied retrospectively.

The Department emphasizes that section 34177.3, subdivision (e) states the section is declaratory of existing law. Further, the Department relies on section 34177.3, subdivision (d), which states: "Any actions taken by redevelopment agencies to create obligations after June 27, 2011, are ultra vires and do not create enforceable obligations," and section 34177.3, subdivision (a), which partly provides: "Successor agencies shall lack the authority to, and shall not, create new enforceable obligations under the authority of the Community Redevelopment Law . . . or begin new redevelopment work, except in compliance with an enforceable obligation that existed prior to June 28, 2011." The Department claims the only extant obligations before that date were obligations of the redevelopment agencies, not the successor agencies, and argues these last two provisions

16

reflect a clear legislative intention that section 34177.3 should apply retrospectively. We do not agree.[10]

Taking the last point first, section 34177.3, subdivision (a) refers to "new" obligations, and by its terms does not preclude *reentry* into "an enforceable obligation that existed prior to June 28, 2011." Such reentry is what section 34178 permits. And subdivision (d) of section 34177.3 refers to "actions taken by redevelopment agencies to create" new obligations, and does not refer to actions taken by *successor* agencies. If the Legislature intended subdivision (d) to refer to successor agencies it would have said so. "Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent." (*Craven v. Crout* (1985) 163 Cal.App.3d 779, 783; see *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 850.)

Turning to the declaration in section 34177.3, subdivision (e), that the provisions of the section "are declaratory of existing law," such statement is incorrect, because

---

[10] The Department's reference to section 34179.5, subdivision (b)(2), part of Assembly Bill 1484, is puzzling. That section confirms that an enforceable obligation "includes any of the items listed" in section 34171, subdivision (d) and adds two further types of enforceable obligations, namely, "contracts detailing specific work to be performed that were entered into by the former redevelopment agency prior to June 28, 2011, *with a third party that is other than the city* . . . that created the former redevelopment agency, and indebtedness obligations as defined in subdivision (e) of Section 34171." (Italics added.) But because section 34179.5 confirms that "*any*" enforceable obligation defined by section 34171 remains enforceable, we fail to see how *additional* obligations described by section 34179.5 are relevant. The fact the agreements at issue do not meet the emphasized definition in section 34179.5 does not obviate the fact that they *do* meet the definition in 34171, as explained above, because they fall within, "*Any* legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy." (§ 34171, subd. (d)(1)(E), italics added.) The use of "any" in both sections 34171 and 34179 reflect expansiveness, not limitation. "From the earliest days of statehood the courts have interpreted 'any' to be broad, general, and all embracing." (*Burnsed v. State Bd. of Control* (1987) 189 Cal.App.3d 213, 217.)

17

section 34177.3 allows the Department to preclude what was permitted by Assembly Bill 1X 26.

A statement that a statute is declarative of existing law *may* bear on the Legislature's intent. (See, e.g., *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243-245 (*Western Security Bank*).) But it is not within the Legislature's bailiwick to interpret laws previously passed. (See *McClung*, *supra*, 34 Cal.4th at pp. 472-473.) At best such a declaration "is but a factor for a court to consider and 'is neither binding nor conclusive in construing the statute.' " (*Id.* at p. 473; see *California Employment Stabilization Com. v. Payne* (1947) 31 Cal.2d 210, 214; *Del Costello v. State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8.) As we have explained previously:

> "The recognition of subsequent assertions of legislative intent is derived from cases where the meaning of the earlier enactment is 'unclear.' [Citation.] It cannot rest upon the notion that the (subsequent) Legislature has authority to interpret the earlier statute for that is a judicial task. [Citation.]

> "The doctrine's legitimate ground is that, as to unsettled questions concerning rules of decision and absent a good reason to the contrary, the Legislature's subsequent resolution should receive deference. [Citation.] It presupposes a case in which the question of meaning is closely balanced, the views of reasonable persons might well diverge, and no private rights have clearly accrued under the earlier statute." (*Sacramento*, *supra*, 22 Cal.App.4th at p. 798.)

We have found *no* ambiguity in the relevant portions of Assembly Bill 1X 26. Assembly Bill 1484 changed the law, expanding the Department's authority to nullify reentered agreements. Accordingly, the statement in section 34177.3, subdivision (e) that "the provisions of this section are declaratory of existing law" is incorrect.[11] If the Legislature wanted to make the change retrospective, it could easily have stated the

---

[11] The Department also contends Assembly Bill 1484 merely "clarified" the law, largely reiterating interpretive claims regarding Assembly Bill 1X 26 that we rejected in Part I, *ante*. But the Department then concedes the contracts would "fail" under Assembly Bill 1484, even if they were otherwise enforceable under Assembly Bill 1X 26. That signals a *change* in the law.

18

changes applied to acts after a specific prior date. Indeed, other parts of Assembly Bill 1484 relied on by the Department did just that, as section 34179.5, subdivision (b)(2) references contracts "entered into . . . prior to June 28, 2011," and section 34178.8 refers to asset transfers after January 31, 2012, and 34177.3 itself references dates in subdivisions (a) and (d), as quoted earlier, showing the Legislature knows how to specify the effective date of statutes.

Accordingly, we conclude section 34177.3 is prospective in application. (See *McClung*, *supra*, 34 Cal.4th at pp. 473-477 [statute that changed existing law not applied retrospectively, despite legislative declaration that it stated existing law]; *Thurman v. Bayshore Transit Management , Inc*. (2012) 203 Cal.App.4th 1112, 1141 (*Thurman*) [statement that a statute was declarative of existing law "insufficient to overcome the strong presumption against retroactivity"].)

We endorse the trial court's cogent summation on this point:

> "The Legislature may well have changed its collective mind about the wisdom of permitting such action [i.e., allowing the reentry of agreements], and certainly had the authority to forbid it on a prospective basis. Indeed, the Legislature had the authority to invalidate actions already taken on a retroactive basis by making a proper declaration of its intent to do so. However, the Legislature could not do what it did--interpret the law by asserting that it was only restating the law as originally enacted."

The lead case relied on by the Department for a contrary result is distinguishable. The Department relies on part of the following quotation:

> " '[A] subsequent expression of the Legislature as to the intent of the prior statute, although not binding on the court, may properly be used in determining the effect of a prior act.' [Citation.] Moreover, even if the court does not accept the Legislature's assurance that an unmistakable change in the law is merely a 'clarification,' the declaration of intent may still effectively reflect the Legislature's purpose to achieve a retrospective change. [Citation.] Whether a statute should apply retrospectively or only prospectively is, in the first instance, a policy question for the legislative body enacting the statute. [Citation.] Thus, where a statute provides that it clarifies or declares existing law, '[i]t is obvious that such a provision is indicative of a legislative intent that the amendment apply

19

to all existing causes of action from the date of its enactment.  In accordance with the general rules of statutory construction, we must give effect to this intention unless there is some constitutional objection thereto.' " (*Western Security Bank*, *supra*, 15 Cal.4th at p. 244; see *Plotkin v. Sajahtera, Inc*. (2003) 106 Cal.App.4th 953, 960-961 (*Plotkin*).)

However, no change in the law was made in that case.  In *Western Security Bank*, the Court of Appeal had interpreted the antideficiency laws, after which the Legislature passed an urgency bill to abrogate the Court of Appeal's holding while the matter was pending before our Supreme Court.  (*Western Security Bank*, *supra*, 15 Cal.4th at pp. 237-238, 241-242.)  The bill provided a statement of legislative intent to confirm a different interpretation of the antideficiency laws, and to abrogate the holding of the Court of Appeal.  (*Id*. at p. 242.)  After reviewing the changes wrought by the bill, *Western Security Bank* found a legislative intention to *clarify* and not to *change* the law, and found such intention applied to the case before it.  (*Id*. at pp. 243-253.)  Thus, no *change* in the law took place.  (*Id*. at p. 252.)  *McClung*, *supra*, 34 Cal.4th 467, distinguished *Western Security Bank* on this very ground.  (*McClung*, at pp. 475-476.)[12]

*McClung* held that where legislation *changes* the law, a legislative statement that it did *not* change the law is insufficient "to overcome the strong presumption against retroactivity." (*McClung*, *supra*, 34 Cal.4th at p. 476; see *id*. at pp. 475-476; see also *Thurman*, *supra*, 203 Cal.App.4th at p. 1141.)  The trial court adhered to *McClung*. (App. 237-238)  So must we.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

It is true, as the Department points out, that one *reason* for the presumptive prospective interpretation of statutes, e.g., reliance interests, would not apply to statutes reorganizing state government.  The Legislature is free, within the confines of the California Constitution, to reconfigure and redistribute authority to its subdivisions as it

---

[12] Nor did a local law change in *Plotkin*, *supra*, 106 Cal.App.4th 953, another case relied on by the Department, it was merely clarified.  (See *id*. at pp. 960-961.)

20

chooses.  (See *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6; *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 209.)  But the fact one reason for the presumptive rule does not apply on the facts of this specific case does not change the rule itself.  Assembly Bill 1484 does not apply retrospectively.

## DISPOSITION

The judgment is affirmed.  Emeryville shall recover costs on appeal.  (See Cal. Rules of Court, rule 8.278.)[13]


      DUARTE      , J.


We concur:


    NICHOLSON    , Acting P. J.


    MURRAY    , J.

---

[13]  We deny Emeryville's pending request for judicial notice as moot, because the proffered material is unnecessary to our decision.