Filed 2/5/21  City of Sunnyvale v. Bosler CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF SUNNYVALE et al., | C081589 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2015-80002067-CU-WM-GDS) |
| v. | |
| KEELY MARTIN BOSLER, as Director, etc., et al., | |
| Defendants and Respondents. | |

Plaintiff City of Sunnyvale, like cities throughout the state, dissolved its redevelopment agency as required by law, became the successor or caretaker agency to wind down its affairs, and attempted to obtain approval from an oversight board to reenter a 1998 reimbursement agreement between the former redevelopment agency and the City of Sunnyvale (Sunnyvale) so as to enable Sunnyvale to continue to receive property tax revenue to pay its preexisting obligation.

1

The dispositive issue on appeal is whether former Health and Safety Code section 34178[1] required Sunnyvale to obtain its oversight board's approval to renegotiate the 1998 agreement or to obtain its approval of the actual renegotiated agreement. We agree with the trial court that the plain meaning of the statute required approval of the actual agreement, not merely authorization to enter into negotiation. We, therefore, affirm the trial court's denial of Sunnyvale's petition for a writ of mandate to compel respondent Department of Finance, through its director, Keely Martin Bosler, (the Department) to acknowledge the validity of the renegotiated agreement.

## BACKGROUND

**Legal Background**

In 1945 the Legislature authorized the formation of community redevelopment agencies and the use of tax increment financing to fund them. "Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the redevelopment agency for repayment of debt incurred to finance the project." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 246-247 (*Matosantos*).)

Local governments embraced tax increment financing and established nearly 400 redevelopment agencies by 2011. (*Matosantos, supra*, 53 Cal.4th at p. 246). The redevelopment agencies' coffers swelled with 12 percent of all of the property taxes collected across the state. (*Id.* at p. 247; Historical and Statutory Notes, 41A Pt. 1 West's Ann. Health & Saf. Code (2014 ed.) foll. § 33500, p. 185.) Thus, tax increment financing

---

[1] Undesignated statutory references are to the Health and Safety Code.

2

was a boon to these redevelopment agencies, but not to schools, special districts, and other taxing entities equally dependent on property tax revenue.  (*Matosantos*, at p. 248.) For them, property tax revenue was frozen.  (*Id*. at p. 250.)

In June 2011 the Legislature declared:  "Redevelopment agencies were created by statute and can therefore be dissolved by statute."  (Assem. Bill No. 26 (2011-2012 1st Ex. Sess.); Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 1, subd. (h).)  The Legislature dissolved nearly 400 agencies, a decision that ultimately became effective on February 1, 2012.  (*Matosantos, supra*, 53 Cal.4th at p. 275.)  Dissolving the agencies may have been accomplished easily by statute, but the winding down of their affairs was more complex. The Legislature sought to establish a mechanism to ensure that all enforceable obligations of the former redevelopment agencies were paid.  But that process is fraught with risks due to the conjoined membership of the various bodies involved.

While the former redevelopment agencies were legal entities separate from the city or county that created them, the governing body of the sponsoring agency generally governed them.  Thus, the same decisionmakers made decisions wearing two hats and, in essence, negotiated with themselves.  In other words, decisionmakers, sitting as members of a city council, entered into reimbursement and funding agreements with the same decisionmakers, sitting as board members of the redevelopment agency the city created. The statutory scheme dissolving and winding down the redevelopment agencies thereafter swapped a successor agency for the redevelopment agency, but the decisionmakers in most cases remain the same—the members of the city council. Attuned to the conjoined nature of many of these decisionmaking bodies, the Legislature declared that "agreements, contracts, or arrangements between the city or county, or city and county that created the redevelopment agency are invalid and shall not be binding on the successor agency."  (§ 34178, subd. (a).)

It should be noted that the role of a successor agency is quite different from the role of a redevelopment agency.  The successor agency is charged with winding down the

3

affairs of the redevelopment agency and is prohibited from taking on new obligations. Successor agencies "succeed to the organizational status of the former redevelopment agency, but without any legal authority to participate in redevelopment activities, except to complete any work related to an approved enforceable obligation." (§ 34173, subd. (g).) Indeed, successor agencies are required to "[c]ontinue to make all scheduled payments for enforceable obligations, as defined in subdivision (d) of Section 34167." (§ 34169, subd. (a); see also § 34177, subd. (a)(3); *Matosantos, supra*, 53 Cal.4th at p. 275.)

Because only enforceable obligations are spared extinction, determining whether a proposed payment meets the statutory definition is a matter of life or death. Two definitions are relevant to this appeal. Enforceable obligations include bonds, loans, payments required by law, judgments or settlements, and certain agreements or contracts (§ 34171, subd. (d)) and "any legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy." (§ 34171, subd. (d)(1)(E).) The term "enforceable obligation" explicitly excludes "any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency." (§ 34171, subd. (d)(2).) "The exclusion of agreements between the former redevelopment agencies and their sponsors in the definition of enforceable obligations [citation] and the express legislative invalidation of these agreements [citation] reflect legislative recognition that 'often' these agreements were not the product of arm's-length negotiations because the two bodies had 'conjoined' membership that was not reflective of the interests of the taxing entities." (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 47-48 (*County of Sonoma*).)

For a mere year, however, the Legislature provided a limited exception to the exclusion of agreements between the former redevelopment agencies and their sponsors from the definition of enforceable obligations. This exception, section 34178, is the central focus of this appeal. The 2011 version of section 34178 stated: "Commencing on

4

the operative date of this part, [any] agreements . . . between the [sponsoring entity] and the redevelopment agency are invalid and shall not be binding on the successor agency; provided, however, that a successor entity wishing to enter or reenter into agreements with [its sponsoring entity] . . . may do so upon obtaining the approval of its oversight board." (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 7.) Additionally, the 2011 version of section 34180, subdivision (h) provided that: "All of the following successor agency actions shall first be approved by the oversight board: [¶] . . . [¶] (h) A request by the successor agency to enter into an agreement with [its sponsoring entity.]" (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 7.) These statutes "unambiguously authorized a successor agency to request approval of a reentry agreement and the oversight board to grant the request." (*County of Sonoma, supra*, 235 Cal.App.4th at p. 48.)

A year later the statute was amended (Assembly Bill No. 1484 (2011-2012 Reg. Sess.) enacted as Stats. 2012, ch. 26, §§6-35) to prohibit a successor agency or oversight board from restoring funding for an enforceable obligation deleted or reduced by the Department pursuant to section 34179, subdivision (h), unless it reflects decisions made during the meet and confer process with the Department or pursuant to court order. (Former § 34178, subd. (a); Stats. 2012, ch. 26, § 14.) The reentered reimbursement agreement at issue here was executed before this amendment became effective. We have determined the 2012 amendment is not retroactive. (*County of Sonoma, supra*, 235 Cal.App.4th at p. 51; *City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 310 (*City of Emeryville*).) Sunnyvale does not contend otherwise.

To mitigate the obvious conflicts of interest between the decisionmakers negotiating on behalf of two masters simultaneously, the Legislature established oversight boards with a very different constituency and with very different fiduciary obligations. An oversight board consists of representatives of the affected taxing entities and is charged with approving certain actions and decisions of the successor agency. (§§ 34177, 34179, 34179.5, 34179.6, 34180, 34181.) Oversight boards have fiduciary

5

responsibilities to both the holders of enforceable obligations and the taxing entities that benefit from distributions of property tax. (§ 34179, subd. (i).) They also must approve the successor agency's recognized obligation payment schedule (ROPS). If approved by the oversight board, the ROPS must be submitted to the Department for its approval. (§§ 34177, 34180.) Successor agencies must prepare and oversight boards must approve a ROPS every six months. (§ 34177.) In short, the Legislature created oversight boards because it realized the same potential for misuse of tax increment funding by successor agencies existed that prompted the dissolution of the former redevelopment agencies in the first place.

**Factual Background**

The facts are neither complicated nor disputed. In 1976 the Sunnyvale redevelopment agency (RDA) agreed, among other redevelopment activities in the Sunnyvale central core, to build a parking structure adjacent to a town center project. In 1977 RDA and Sunnyvale executed an agreement under which RDA would reimburse Sunnyvale with tax increment revenue for the city's purchase of the land for the parking structure and other redevelopment expenditures. In 1998 RDA sold certificates of participation to investors to refinance its debt for the parking structure. Sunnyvale leased the parking facility from RDA for the amount necessary for RDA to pay back the certificates of participation. RDA then reimbursed Sunnyvale for the certificates of participation.

In February 2012 RDA was dissolved and Sunnyvale became its successor agency. The notice and agenda for the oversight board's April 9, 2012 meeting includes "Presentation and Approval of Certified Recognized Obligation Payment Schedule (ROPS)." There is nothing on the agenda regarding approval of an amended reimbursement agreement. A unanimous board passed a motion that " 'The Oversight Board, under Section 34178(a), directs the Successor Agency to enter into a reimbursement agreement for Item 2, Certificates of Participation, to reimburse the City

6

for this debt, and adds the item to the ROPS, subject to the Auditor/Controller's certification of the item.' " The certified ROPS was approved.

On April 24, 2012, the Sunnyvale City Council, not the oversight board, considered a resolution entitled "Approval for City to Execute an Amended and Restated Reimbursement Agreement for 1998 Certificates of Participation." The staff recommended the city council approve the resolution "authorizing the City of Sunnyvale to enter into an Amended and Restated Reimbursement Agreement with the Sunnyvale Successor Agency pursuant to Health and Safety Code Section 34178(a) for the reimbursement of payments, costs and interest on the Certificates of Participation (Parking Facility Refunding) Series 1998A." The city council approved and adopted the amended and restated reimbursement agreement. As did the successor agency. The oversight board did not. The city and successor agency executed an amended and restated reimbursement agreement on April 24, 2012.

Sunnyvale insists that the oversight board again approved the successor agency's action of re-entering the reimbursement agreement on April 26 and May 14, 2012, by approving the second ROPS, ROPS II. But the oversight board's consideration of ROPS II was tabled at the April 26 meeting, and it does not include any reference to a reimbursement agreement.

In May 2012 the Santa Clara County Auditor-Controller would not add the reimbursement agreement and certify the successor agency's ROPS. On May 14, the oversight board passed a motion "to approve the obligation for the 1998 Certificates of Participation as noted in Item 2 subject to Successor Agency staff working out an appropriate reimbursement agreement and subject to certification by the County Auditor/Controller." Item No. 2 read, "2) Reimbursement for 1998 Certificates of Participation." The Sunnyvale City Attorney thereafter revised the agreement. The city and the successor agency did not execute the amended reimbursement agreement, until it was revised by the Sunnyvale City Attorney.

It was not until September 2014 that the successor agency listed the "Amended and Restated Reimbursement Agreement for the 1998 Certificates of Participation" on the ROPS for the period from January 1, 2015, through June 30, 2015. The oversight board approved the ROPS for the period but the county controller again objected and asked that the amended and restated reimbursement agreement be removed from the ROPS.

On December 17, 2014, the Department rejected the amended and restated reimbursement agreement. The Department wrote, "The Agency stated that this Agreement was reentered into pursuant to HSC section 34178(a). However, it is our understanding that neither the Oversight Board (OB) nor Finance approved the terms of the Agreement." Sunnyvale complains that the Department had approved earlier ROPS without mention of the approval deficit. But the Department's letter regarding ROPS I and II provides that decisions approving items on the ROPS are not binding on future ROPS.

Sunnyvale, in its own right and as the successor agency to the RDA, filed a petition for a writ of mandate and a complaint for declaratory relief alleging that Michael Cohen, then the director of the Department, abused his discretion by refusing to recognize the amended and restated reimbursement agreement as an enforceable obligation. The trial court denied the petition, ruling that the reimbursement agreement was not an enforceable obligation because the oversight board never approved it, as required by section 34178 and dismissed the claim for declaratory relief. Sunnyvale, as the city and as the successor agency, appeals.

## DISCUSSION

### I

### Standard of Review

Because tax increment financing is no longer available and redevelopment agencies have met their demise, the only way Sunnyvale can continue to receive a

8

disproportionate share of the property tax revenue is to demonstrate that it reentered a valid reimbursement agreement, which now constitutes an enforceable obligation the county auditor must honor and pay from the redevelopment property tax trust fund (RPTTF). There are no disputed facts, only a debate over the meaning of various statutes enacted as a part of dissolving all the redevelopment agencies in the state. As Sunnyvale points out we are not asked to reweigh the evidence, but only to determine the legal consequence of the undisputed facts. We are, therefore, confronted with a quintessential question of statutory construction, a question of law we review de novo. We are no stranger to this task in cases involving the winding down of redevelopment agencies. (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 220; *City of San Jose v. Sharma* (2016) 5 Cal.App.5th 123, 134; *City of Tracy v. Cohen* (2016) 3 Cal.App.5th 852, 860; *County of San Bernardino v. Cohen* (2015) 242 Cal.App.4th 803, 809; *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 493; *County of Sonoma, supra*, 235 Cal.App.4th 42, 47; *City of Emeryville, supra*, 233 Cal.App.4th 293, 297.)

"Interpreting statutes against a backdrop of undisputed facts, as here, presents questions of law that we determine independently. 'Our objective in interpreting a statute is to determine legislative intent so as to effectuate the law's purpose. The first thing we do is read the statute, and give the words their ordinary meanings unless special definitions are provided. If the meaning of the words is clear, then the language controls; if not, we may use various interpretive aids,' such as the statutory context and framework, and legislative history." (*County of Colusa v. Douglas* (2014) 227 Cal.App.4th 1123, 1129.)

## II

### The Meaning of Approval in Sections 34178 and 34180

We begin with the statutes at the fulcrum of this appeal. The 2011 version of section 34178 provided: "Commencing on the operative date of this part, agreements, contracts, or arrangements between the city or county, or city and county that created the

9

redevelopment agency and the redevelopment agency are invalid and shall not be binding on the successor agency; provided, however, that a successor entity wishing to enter or reenter into agreements with the city, county, or city and county that formed the redevelopment agency that it is succeeding may do so upon obtaining the approval of its oversight board." (Former § 34178, subd. (a); Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 7.) "Further, section 34180, subdivision (h) requires oversight board approval of a request by a successor agency to enter into such an agreement." (*City of Emeryville, supra*, 233 Cal.App.4th at p. 299.)

In *City of Emeryville, supra*, 233 Cal.App.4th 293 and *County of Sonoma, supra*, 235 Cal.App.4th 42, we considered whether agreements approved by oversight boards under these sections were enforceable obligations of a former redevelopment agency that continue to be payable out of property taxes before distribution of the remainder to the taxing agencies. (§ 34171, subd. (d); see § 34183, subd. (a)(2)(C).) Sunnyvale argues these cases are dispositive and validate their claim that the amended and restated reimbursement agreement is an enforceable obligation. The trial court found our cases inapposite. Although the same statutes were involved in both cases, we agree with the trial court that neither case addressed the issue now before us.

Sunnyvale insists that we equated authorization with approval in these cases. Not so. The meaning of approval was not before us. In *City of Emeryville*, we did uphold the city's contention that the agreements it reentered as the successor agency to the former redevelopment agency and were then put on the amended ROPS were enforceable obligations precisely because the city had sought and obtained the approval of its oversight board. (*City of Emeryville, supra*, 233 Cal.App.4th at pp. 301-302.) We rejected the Department's assertion that section 34178, subdivision (a) did not authorize Emeryville to reenter into the agreements because disparate sections of the law established the Legislature's desire to halt redevelopment agency activity and freeze existing assets. (*City of Emeryville*, at p. 303.) "Most agreements between former

10

redevelopment agencies and their organic bodies were invalidated (§ 34178, subd. (a)) as Emeryville conceded. A definitional section provides: 'For purposes of this part, "enforceable obligation" does not include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency.' (§ 34171, subd. (d)(2).) [¶] . . . But none of these statutes, individually or collectively, changes the fact that in the very same bill, Assembly Bill IX 26, the Legislature explicitly authorized successor agencies to enter or *reenter* into agreements, subject to approval by oversight boards." (*Id.* at p. 305.)

Secondly, we found that the 2012 amendment to section 34177.3 is not retroactive. "[S]ection 34177.3, subdivision (c) partly provides that, 'Successor agencies shall lack the authority to . . . transfer any powers or revenues of the successor agency to any other party . . . except pursuant to an enforceable obligation on a [ROPS] approved by the department. Any such transfers of authority or revenues that are not made pursuant to an enforceable obligation on a [ROPS] approved by the [Department] are hereby declared to be void . . . .' Subdivision (a) of section 34177.3 precludes 'new redevelopment work,' except as to enforceable obligations that existed before Assembly Bill IX 26 took effect. Subdivision (d) partly provides: 'Any actions taken by redevelopment agencies to create obligations after June 27, 2011, are ultra vires and do not create enforceable obligations.' " (*City of Emeryville, supra*, 233 Cal.App.4th at p. 307.) We did not agree with the Department's claim that the only extant obligations before the dissolution law was enacted in June of 2011 were obligations of the redevelopment agencies, not the successor agencies. To the contrary, reentry into an enforceable obligation that existed before June of 2011 is exactly what section 34178 permits. (*City of Emeryville*, at p. 309.)

Nowhere in the opinion in *City of Emeryville* did we, however, examine the meaning of approval by an oversight board. We recognized that section 34178 *authorized* successor agencies to reenter agreements, subject to approval by the oversight

11

board, that would then remain enforceable obligations. Nowhere did we suggest that authorization is equivalent to approval.

Nor was the meaning of approval addressed in *County of Sonoma, supra*, 235 Cal.App.4th 42, the other case heralded by Sunnyvale as dispositive. Like *City of Emeryville*, *County of Sonoma* rebuffed different issues involving section 34178 raised by the Department and affirmed the trial court's finding that the agreements it reentered, and the oversight board approved, remained enforceable obligations. Again we rejected the Department's reliance on the alleged spirit of the overall legislation, a spirit at odds with the plain and unambiguous language of sections 34178, subdivision (a) and 34180, subdivision (h). (*County of Sonoma*, at pp. 47-48.) We concluded: "The 2011 version of sections 34178, subdivision (a) and 34180, subdivision (h) . . . unambiguously authorized a successor agency to request approval of a reentry agreement, and an oversight board to grant the request. Under the well-established interpretive principle just cited, this express grant of authority cannot simply be negated through resort to the spirit of the Great Dissolution Law." (*Id.* at pp. 48-49, fn. omitted.)

We further rejected the Department's contention that an oversight board could not approve a reentry agreement because a successor agency was not authorized to take on new obligations. We relied on the clear language of section 34178, subdivision (a) that "*successor agencies* with the approval of their oversight boards could *also* establish a reentry agreement as an enforceable obligation in an ROPS. (Former § 34178[, subd.] (a).) Thus, an oversight board is not approving an *unauthorized* act." (*County of Sonoma, supra*, 235 Cal.App.4th 42 at p. 49.) What we did not say is that an oversight board may simply authorize a successor agency to negotiate revisions to an agreement previously executed by the former redevelopment agency and the sponsoring agency without thereafter approving the amended agreement. Sunnyvale has quite simply asserted a false equivalency between two words, authorization and approval, which have very distinct meanings.

12

*City of Emeryville* and *County of Sonoma* are, as Sunnyvale suggests, important cases reaffirming that successor agencies had a year in which the Legislature allowed them to protect a disproportionate share of property tax revenue by reentering agreements of their former redevelopment agencies. They do not, however, support Sunnyvale's central claim that the oversight board did not need to approve the actual agreement the successor agency proposes to execute. On this point, we agree with the trial court that *City of Emeryville* and *County of Sonoma* are inapposite. We must rely therefore on common rules of statutory construction beginning with the most elemental principle that we must turn first to the words of the statute.

Under former section 34178, the Legislature established the general rule invalidating agreements between the sponsoring agencies and the former redevelopment agencies. The governance of a sponsoring agency, as in this case, is often the same body that governs the successor agency. Here the pivotal entity is the City of Sunnyvale. Section 34178 provided that those type of incestuous agreements were invalid and not binding on the successor agency. But, of course, the Legislature carved out an express exception to this general rule of invalidity, and it is the Legislature's narrow exception that is at issue here. The general rule set forth in former section 34178, subdivision (a) is followed by a huge "however." Following the general rule of invalidity, the statute provided: "However, that a successor entity wishing to enter or reenter into agreements with [its sponsoring entity] . . . may do so upon obtaining the approval of its oversight board." (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 7.)

The question squarely presented is approval of what? Sunnyvale insists the successor agency need only approve the "act" of entering into negotiations. The Department argues, and the trial court found, that the oversight board must approve the result of those negotiations—the actual amended and restated reimbursement agreement. The trial court explained: "The evidence furnished by Petitioners shows that while the Oversight Board may have *directed* the Successor Agency to enter the Re-entered

13

Reimbursement Agreement at its April 9, 2012 meeting, it did not *approve* it. Indeed, the Oversight Board could not have approved it, as it did not yet exist. Additionally, Petitioners have furnished no evidence indicating that the Oversight Board did, in fact, 'approve' the Re-entered Reimbursement Agreement."

Sunnyvale argues there is nothing in the language of section 34178 requiring the oversight board to later review and then approve the agreement. In the absence of such a directive, they maintain that directing or authorizing the successor agency to reenter the agreement is sufficient. Indeed, they cite to the wisdom of the oversight board in making its approval contingent upon certification by the county auditor-controller who, according to Sunnyvale, vigilantly protected the interests of the other taxing entities. They also cite to administrative cases in entirely different contexts wherein "approval" is a decision by an agency which commits the agency to a definite course of action, but may involve instructing others or its staff to follow through.

Sunnyvale's cases are easily distinguished as neither involve the dissolution of redevelopment agencies or the specific statute at issue. "Approval" is the word that triggers extensive environmental review under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and its accompanying Guidelines (Cal. Code Regs., tit. 14, §15000 et seq.). In *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 134, the issue was whether a private-public development agreement conditioned on CEQA compliance but allowing postponement of the preparation of an environmental impact report constitutes "approval" under CEQA. The Supreme Court held that "[a] CEQA compliance condition can be a legitimate ingredient in a preliminary public-private agreement for exploration of a proposed project, but if the agreement, viewed in light of all the surrounding circumstances, commits the public agency as a practical matter to the project, the simple insertion of a CEQA compliance condition will not save the agreement from being considered an approval requiring prior environmental review." (*Id.* at p. 132.) The court's construction of approval to mean the point at which

the public agency commits to a project is consistent with the essential purpose of CEQA to compel environmental study and review at the earliest possible juncture. It has absolutely no bearing, however, on the dissolution of redevelopment agencies and the distinctly different purpose "approval" by an oversight board during the dissolution process is designed to achieve.

*Golightly v. Molina* (2014) 229 Cal.App.4th 1501 is equally inapposite. *Golightly* involved a county board of supervisors' delegation of authority to enter into social program agreements to four administrative officers to provide social services to county residents. (*Id*. at p. 1505.) Each of the administrative officers was required to approve the proposed agreement, but they did not meet collectively to approve it. (*Ibid*.) The issue presented, whether the Ralph M. Brown Act (Gov. Code § 54950 et. seq.) applied, bears no relevance to the meaning of approval in Health and Safety Code section 34178. Neither case casts any light on the meaning of approval as used by the Legislature in Health and Safety Code section 34178.

The plain meaning of the word, the context in which it appears, and the statutory purpose for the requirement of an oversight board to approve these specific kinds of agreements, however, do illuminate the Legislature's intent. A successor agency, under the limited exception provided by former section 34178, must "obtain[ ] the approval of its oversight board." Sunnyvale, mimicking the logic of the cases we distinguished above, contends that it is undisputed that the oversight board authorized entry into a reimbursement agreement, whatever the precise terms of that agreement turned out to be. Sunnyvale's interpretation would allow approval of any sponsoring-entity agreement— whether a reentered agreement or entirely new—without any examination by the oversight board of whether the terms of that agreement are in the best interests of the taxing entities or the holders of enforceable obligations. Such an interpretation does violence to the statutory language, design, and purpose.

We emphasize that the Legislature chose the word "approval," not authorization, and we have debunked Sunnyvale's attempt to equate the two. The " 'meaning of a statute is to be sought in the language used by the Legislature.' " (*City of Emeryville, supra*, 233 Cal.App.4th at p. 304.) Had the Legislature intended to use the term "authorize," it could have done so. But given the Legislature's decision to require "approval," rather than "authorization," approval must mean more than simply authorizing the successor agency to enter into an agreement. Rather, the Legislature must have meant for the oversight board to engage in meaningful review of the terms of the agreement.

The plain meaning of approval of the terms of the reentered agreement is consistent with the structure of section 34178 and the purpose for the limited exception to the general rule of invalidity. Remember the inherent conflicts of interest that plague the conjoined governing bodies of the former redevelopment agency, the sponsoring entity, and the successor agency. The Supreme Court highlighted the problem in *Matosantos, supra*, 53 Cal.4th 231: "Redevelopment agencies and their community sponsors are conjoined to the extent that, in virtually all instances, the same individuals constitute both the redevelopment agency governing board and the city council or county board of supervisors that created the agency." (*Id*. at p. 266.) Our observation was more targeted in *County of Sonoma, supra*, 235 Cal.App.4th 42 wherein we explained why the Legislature sought to prohibit agreements between sponsoring and successor agencies. "The exclusion of agreements between the former redevelopment agencies and their sponsors in the definition of enforceable obligations (§ 34171, subd. (d)(2) . . .) and the express legislative invalidation of these agreements (§ 34178, subds. (a) & (b) . . .) reflect legislative recognition that 'often' these agreements were not the product of arm's-length negotiations because the two bodies had 'conjoined' membership that was not reflective of the interests of the other taxing entities." (*Id.* at pp. 47-48.)

16

When the Legislature decided, albeit briefly, to create a limited exception, it did so carefully. That is to say, the Legislature created a mechanism to give those tax entities which would lose tax revenue if agreements between sponsoring entities and former redevelopment agencies were reentered by sponsoring agencies the power to determine whether or not to approve them. Thus, it was the oversight boards which became the bulwark against merely replacing redevelopment agencies with successor agencies armed with unfettered freedom to perpetuate the inequities tax increment financing had allowed.

We return to basic rules of statutory construction. The intent of the statute " 'prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.]" (*People v. Pieters* (1991) 52 Cal.3d 894, 899.) Moreover, statutes must be read " 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (*Ibid.*) Finally, "[i]t is a fundamental rule that a statute should be construed in the light of the history of the times and the conditions which prompted its enactment,' [citation]." (*People v. Fair* (1967) 254 Cal.App.2d 890, 893.)

Given the importance of the oversight boards in fostering the legislative goal of redistributing property tax revenue and ensuring the reentered agreements were a product of arm's-length bargaining, it is clear the Legislature did not intend for "approval" by an oversight board to be a rubber stamp. To the contrary, the Legislature vested oversight boards with the fiduciary responsibility to carefully consider the terms of any agreement between the sponsoring entity and the successor agency and make sure those terms are consistent with the dissolution law. Needless to say, the oversight board here could not exercise its fiduciary duties to the taxing entities and the holders of the obligations if it merely authorized negotiations and never reviewed the actual terms of the agreements it was obliged to approve.

For the first time on appeal, Sunnyvale contends sections 34180, subdivision (h) and 34179, subdivision (c) support its position that the oversight board's approval of

17

negotiations, or as Sunnyvale characterizes it, approval of "actions," satisfies its fiduciary obligations under section 34178. Section 34180 identifies "[a]ll of the following successor agency actions" that must be first approved by the oversight board and subdivision (h) includes "[a] request by the successor agency to enter into an agreement with the city, county, or city and county that formed the redevelopment agency that it is succeeding." Sunnyvale tortures the letter and the spirit of the section. We disagree that the Legislature's utilization of the broad term "actions" as a prologue to a list of a wide-ranging activity by the successor agency, thereby excuses the agency of the obligation to scrutinize the terms of the actual agreement.

Section 34179, subdivision (c) authorizes an oversight board to "direct the staff of the successor agency to perform work in furtherance of the oversight board's duties and responsibilities under this part." The statute is unremarkable in providing an oversight board with staffing to fulfill its mandate. But there is nothing in the language of the statute allowing an oversight board to delegate its authority to approve agreements and, indeed, such a delegation to the staff of a successor agency would undermine the very purpose for establishing an oversight board.

Sunnyvale raises a number of arguments we need not address. It contends there were only minor differences between the preexisting agreement executed by RDA and the city and the ultimate amended and restated reimbursement agreement. It insists the oversight board did not breach its fiduciary duties because the Santa Clara Auditor-Controller took an active role in redrafting the agreement, approved the amended agreement incorporating the controller's changes, approved the ROPS schedule identifying the 1998 Certificates of Participation, and informed the Department the obligation was payable. Finally, Sunnyvale emphasizes the oversight board was approving reentry into an existing agreement. It was thus familiar with the terms of the existing 1998 Certificates of Participation and did not abdicate all responsibility with regard to the agreement Sunnyvale sought to reenter. None of these arguments affect our

18

de novo review of the meaning of the statutes before us and, more to the point, elucidate the Legislative intent in requiring oversight board approval of reentered agreements.[2]

Sunnyvale does raise one final argument that bears mentioning. Sunnyvale asserts that oversight board approval of the ROPS in essence was approval of the amended and restated reimbursement agreement. If, as phrased this way, the question presented is a question of fact—whether there was oversight board approval, there is ample evidence to support the trial court's finding the oversight board did not approve an agreement on April 9, 2012, that did not exist and the obligation did not appear on the ROPS until months later. But we continue to believe the question is one of law, not fact. Simply put, the statute calls for the oversight board to approve the agreement, not the amount of the obligation because, as we discussed at length above, the role of the taxing entities and other independent voices on the oversight board is crucial to achieving the goal of the dissolution law to redistribute property tax revenue more equitably, except in the rare instances it remains in the taxing entities best interest to recognize and reenter former agreements.

### III

### Does Section 34171 obliterate Section 34178?

Section 34171, subdivision (d)(2) excludes agreements between the city, county, or city and county that created the former redevelopment agency and the former redevelopment agency from the definition of enforceable obligations, but section 34171,

---

[2] While Sunnyvale argues how similar the amended and restated reimbursement agreement was to the original, the Santa Clara Auditor-Controller insists that the various drafts of the amended agreement were substantially different. The controversy highlights the very need for oversight board review. It should be up to the board, not us, to examine the minutia of the agreements and determine the significance of any differences. The Legislature wisely assigned this task to the oversight boards, which have a fiduciary obligation to review all the terms and conditions before they approve an agreement between a sponsoring entity and a successor agency.

subdivision (d)(1)(E) includes "[a]ny legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy" as enforceable obligations. Sunnyvale contends that the amended and restated reimbursement agreement qualifies as a subdivision (d)(1)(E) legally binding and enforceable agreement and it does not violate the debt limit or public policy. As a result, in Sunnyvale's view, the agreement qualifies as an enforceable obligation under the subdivision (d)(1)(E) alternative, even if the agreement was not approved by the oversight board as required by section 34178. If we were to ignore prominent rules of statutory construction, as we would need to do to accept Sunnyvale's argument, we would obliterate section 34178 for all practical purposes and allow successor agencies to evade their statutory responsibility to obtain approval from their oversight boards to reenter agreements formerly executed by the sponsoring and successor agencies.

To name but the most obvious of the applicable rules of statutory construction, " 'Courts should give meaning to every word of a statute if possible.' " (*Reno v. Baird* (1998) 18 Cal.4th 640, 658.) In other words, various parts of a law must be harmonized to render each of the sections operable and to avoid an implied repeal. Most apt in these circumstances, a specific, special provision prevails over a general one, the former to be treated as an exception to the general provision. (*Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1005.)

Sections 34178 and 34171, subdivision (d)(1)(E) are easily harmonized by treating section 34178 as a special exception to the general definition of enforceable obligation and by giving meaning to each word in both statutes. Section 34171, subdivision (d)(1)(E) states the general rule that legally binding contracts existing at the time the redevelopment agencies were dissolved become enforceable obligations of the successor agency. But that general rule is limited by the special circumstance recognized in section 34178 and 34171, subdivision (d)(2)—those preexisting agreements between the sponsoring entity and successive agency. As to those dangerous deals, former section

20

34178 required approval by the oversight board. Thus, both statutes can, and should, be harmonized.

But Sunnyvale, relying on a footnote immersed in an analysis of retroactivity, insists that in *City of Emeryville* we made the expansive proclamation that reentered agreements are enforceable obligations either pursuant to section 34178 or section 34171, subdivision (d)(1)(E). We disagree. First, the issue posed by Sunnyvale was not before us in *City of Emeryville* and cases do not provide authority for issues that are not presented and decided. We simply did not consider whether applying the definition of an enforceable obligation under section 34171, subdivision (d)(1)(E) would nullify the approval requirement set forth in section 34178. Second, in the footnote cited, we were merely describing our befuddlement over the Department's reliance on a statute to support its argument the statute was retroactive. In that context, we observed that the dissolution law contained an expansive definition of enforceable obligations. We did not opine, in this footnote involving retroactivity, how the two sections might collide and how any potential conflict between our construction of the two could be reconciled. Sunnyvale betrays a level of desperation in attempting to catapult an irrelevant footnote into persuasive authority for an unrelated and important proposition of law.

**IV**

**Leftovers**

Sunnyvale submitted a declaration of a single member of the oversight board with its reply brief in the trial court. It argues the trial court abused its discretion by sustaining the respondents' evidentiary objections to most of the declaration. On appeal, it fails to present a cogent argument or a single case citation to demonstrate an abuse of discretion. On the record before us, we can find no abuse of discretion.

The board member declares that the oversight board did not contemplate any further action on the reentered amended and restated agreement after it authorized the successor agency to reenter into the agreement and that it was not the practice of the

21

oversight board to review and approve the exact language of agreements oversight boards authorize and approve. "[T]he views of individual legislators, staffers, or other interested persons" are not relevant for ascertaining the intent of a governmental body " 'as a whole.' " (*People v. Patterson* (1999) 72 Cal.App.4th 438, 443.) Moreover, because we reject Sunnyvale's dilution of the meaning of approval, exclusion of the board member's declaration was not prejudicial even if it was misguided. A single board member's expectation as to whether or not the final draft of the agreement would be presented to the full board would have been irrelevant to resolution of the question what approval means under the statute as a matter of law.

Finally, Sunnyvale maintains that the oversight board approved the reentered agreement at an open meeting in full compliance with the Ralph M. Brown Act. The Ralph M. Brown Act is a non-issue in this appeal. The trial court did not rule there was a violation of the Ralph M. Brown Act and we need not address it here. The sole dispositive issue is whether former section 34178 allowed the oversight board to approve an agreement that otherwise would not qualify as an enforceable obligation by authorizing respondents to negotiate its terms without reviewing and approving the actual terms of the agreement. For all the reasons discussed herein, we conclude it did not. The Ralph M. Brown Act is simply not an issue.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

                                                        /s/
                                         RAYE, P. J.

We concur:

     /s/
ROBIE, J.

     /s/
MURRAY, J.